UNITED STATES DISTRICT COURT                     b
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| DARRELL SMALL | CIVIL ACTION 1:17-CV-01497 |
| VERSUS | JUDGE DRELL |
| UNITED STATES OF AMERICA | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION

Defendant United States of America filed a Motion to Dismiss (Doc. 11) Plaintiff's complaint pursuant to Fed. R. Civ. P. rule 12(b)(6), for failure to state a claim on which relief may be granted. Because Plaintiff's claims are barred by the Eleventh Amendment and Heck v. Humphrey, Defendant's Motion to Dismiss should be granted.

## I.   Background

### A.   Procedural Background.

Plaintiff Darrell Small ("Small") filed a complaint pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680. The sole Defendant is the United States of America ("the government").[1] Small is presently incarcerated in the Natchitoches Parish Detention Center ("NPDC") in Natchitoches, Louisiana.

Small contends that, when he was arrested by the United States Marshal's Service ("USMS"), deadly force was used (he was tased and shot) even though he was no longer resisting arrest. Small contends the USMS agents: (1) intentionally used

---

[1] To sue successfully under the FTCA, a plaintiff must name the United States as the sole defendant. See McGuire v. Turnbo, 137 F.3d 321, 324 (5th Cir. 1998) (citing Atorie Air, Inc. v. Federal Aviation Administration, 942 F.2d 954, 957 (5th Cir. 1991)).

excessive and deadly force that resulted in physical and mental pain and suffering; and (2) were negligent in pointing loaded firearms and a taser at Small after he had been secured, resulting in severe physical pain and suffering. Small seeks monetary damages, costs, and attorney's fees.

Small contends he exhausted his administrative remedy (Doc. 23)[2] and timely filed this action.

The government filed a Motion to Dismiss (Doc. 11), contending Small's claim is barred by Heck v. Humphrey, 512 U.S. 477 (1994). Small filed a response (Doc. 14), to which the government replied (Doc. 15). The government's Motion to Dismiss is now before the Court for disposition.

## B.  Factual Background.

In 2014, an arrest warrant was issued for Small by a Texas state court for aggravated assault causing bodily injury by use of a deadly weapon (a firearm) (Doc. 11-4, p. 3/7; Doc. 11-6). On August 12, 2014, Small was arrested in Natchitoches,

---

[2] The requirement of exhaustion of administrative review is a jurisdictional requisite to the filing of an action under the FTCA. See Molinar v. United States, 515 F.2d 246 (5th Cir. 1975). Because it is a jurisdictional prerequisite, the filing of an administrative claim cannot be waived. See Gregory v. Mitchell, 634 F.2d 199, 203–04 (5th Cir. 1981); see also McNeil v. U.S., 508 U.S. 106, 113 (1993) ("The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies.").

In his administrative claim, Small claimed the marshals shot him in the leg while he was in his vehicle, tased him after he surrendered and had his hands up, and damaged his vehicle (Doc. 23). Small seeks $250,000 for pain and suffering, and $4,266.00 for property damage to his vehicle. The USMS denied that claim, finding there had not been any negligence on the part of a Marshal (Doc. 23).

Small contends in his complaint that the Marshals: (1) intentionally used excessive and deadly force that resulted in physical and mental pain and suffering; and (2) were negligent in pointing loaded firearms and a taser at Small after he had been secured. Those claims appear to fall within the scope of Small's administrative claim. See Pleasant v. U.S. ex rel. Overton Brooks Veterans Admin. Hosp., 764 F.3d 445, 449 (5th Cir. 2014) (a notice of claim requirement is satisfied "if the claimant (1) gives the agency written notice of his claim sufficient to enable the agency to investigate and (2) places a value on his claim.").

Louisiana pursuant to that warrant. In 2017, in the Louisiana Tenth Judicial District Court in Natchitoches Parish, Small was tried and convicted by a jury of one count of aggravated obstruction of a highway of commerce (Doc. 11-7). Small was then sentenced as a habitual offender to 22 years of imprisonment (Doc. 11-8).

Small's arrest in 2014 is the subject of this lawsuit. Defendant attached an excerpt from Small's Louisiana criminal trial transcript to its Motion to Dismiss (Doc. 11). The trial testimony is summarized here. Small's objection to consideration of the trial testimony is discussed below in the analysis.

### 1. <u>Deputy Marshal Turner</u>

At Small's 2017 trial, U.S. Deputy Marshal Donnie Turner testified the USMS received a telephone call on August 12, 2014, informing them that Small, a violent offender wanted in Texas on a felony warrant, was in Natchitoches (Doc.11-2, pp. 3-5/223). Small had recently purchased a new vehicle with a GPS locator in it (Doc. 11-2, p. 5/223). The dealership provided the USMS with the coordinates of Small's vehicle (Doc. 11-2, p. 6/223).

Turner testified that the USMS violent offender task force, composed on that day of contingents from Shreveport, Alexandria, and Natchitoches for a total of about 20 officers, met in Natchitoches at about 4 p.m. in unmarked vehicles (Doc. 11-2, pp. 6-7/223). The officers parked in the parking lot of a nearby electric company (Doc. 11-2. P. 27/223). They wore tactical gear and bullet-proof vests that were visibly marked (Doc. 11-2, p. 8/223). Some officers waited outside the apartment complex where Small's vehicle was located (Doc. 11-2, p. 9/223).

Deputy Marshal Turner testified that, as a supervisor, he was never told that people had difficulty identifying task force participants as law enforcement officers when they were deployed (Doc. 11-2, pp. 24/-25/223).  Turner testified they are always visibly marked as a U.S. Marshal task force (Doc. 11-2. P. 25/223).

Deputy Marshal Turner testified that, when Small exited an apartment in the complex, he moved quickly to his car and left in it (Doc. 11-2, p. 11/223).  The task force did not have an opportunity to intercept Small before he got into his vehicle (Doc. 11-2, p. 12/223).   It was still daylight when Small got into his vehicle, a gold Impala, and the task force completed the take-down (Doc. 11-2, p. 27/223).

The task force waited until they saw what direction Small was driving, then intercepted Small's vehicle in the street by blocking access to the intersection with lights and sirens on, forcing him to stop his car (Doc. 11-2, pp. 27, 48/223).  Everyone in Turner's vehicle and the task force vehicle next to him exited their cars with their weapons drawn (Doc. 11-2, p. 27/223).  There were units behind Small at each exit and units in front of him, for the purpose of making his vehicle immobile (Doc. 11-2, p. 39/223).

Deputy Marshal Turner testified that all of the law enforcement personnel began giving Small verbal commands, saying "Police, police, show hands." (Doc. 11-2, p. 29/223).  After the officers exited their vehicles, Small began driving down the street in reverse at a high rate of speed (about 50 miles per hour) (Doc. 11-2, pp. 28-29, 49/223).  Another task force vehicle–a white pickup that had been trailing Small's car–was stopped in the road about 50 yards behind Small (Doc. 11-2, pp. 28-29,

42/223).  While the pickup remained parked in the road, Small continued to drive in reverse until he crashed into it (Doc. 11-2, pp. 29, 46/223).  Turner testified it took only seconds for Small to drive in reverse and hit the pickup (Doc. 11-2, p. 49/223).

Turner further testified that neither the white pickup nor any other task force vehicle rammed into Small's car (Doc. 11-2, pp. 46-47/223).

The rear of Small's Impala was lifted off the ground and stuck "on the bumper grill" of the white pickup, so it could not move (Doc. 11-2, p. 32/2332).  The four officers who had been in the white pickup exited, as well as officers in two other vehicles, and stood by Small's car with weapons drawn (Doc. 11-2, pp. 32, 42-44/223).  Deputy Marshal Turner arrived and warned the others about crossfire, so they wouldn't accidentally shoot one another (Doc. 11-2, p. 48/223).

Turner testified that Small made no effort to surrender (Doc. 11-2, p. 32/223).  The officers were standing in front of and on one side of Small's car, in an "L" shaped assault designed to avoid being hit by their own cross-fire (Doc. 11-2, p. 33/223).  The officers again gave Small verbal commands to put his hands up, stop the car, and get out of the car, and an officer tried to break the passenger side window glass so they could see inside the vehicle (Doc. 11-2, p. 45/223).  The windows were tinted too dark to allow the officers to see well inside (Doc. 11-2, p. 45/223).  Small continued to press the gas pedal, spinning his tires continuously until his car broke free of the truck and began to fishtail (Doc. 11-2, pp. 31-33/223).  Deputy Marshal Turner testified that Small's wheels never stopped spinning (Doc. 11-2, p. 45/223).  It took less than a minute for Small's vehicle to break free from the white pickup (Doc. 11-2, p. 49/223).

5

Once Small broke free, the officers near Small's vehicle began to fire shots (Doc. 11-2, pp. 32-33/223). Turner testified that, at that point, Small's vehicle was a deadly weapon (Doc. 11-2, pp. 32-33/223). Small drove away from the officers, cutting across the grass (and perhaps a small ditch) to get around their vehicles (Doc. 11-2, pp. 33, 47/223).Deputy Marshal Turner testified that shots were fired as Small drove away (Doc. 11-2, p. 33/223). He assumed Small had been hit when his car drifted some, but it suddenly picked back up, went up to the stop sign at the intersection (where the task force had initially attempted to stop Small), and drove toward town (Doc. 11-2, p. 34/223). The white pickup pursued Small (Doc. 11-2, pp. 34, 36/223). Turner testified that, by the time he and other officers returned to their vehicles and caught up with the white pickup and Small, the occupants of the pickup had again exited their vehicles and were "making contact with" Small (Doc. 11-2, p. 36/223). Small was in custody (Doc. 11-2, p. 37/223).

Deputy Marshal Turner testified that the "final takedown" occurred in a sharp curve in Mill Street (Doc. 11-2, p. 37/223). Turner testified that Small appeared to have been hit in his leg by gunfire, and he was transported to the hospital (Doc. 11-2, p. 37/223). The Natchitoches Police Department investigated the incident (Doc. 11-2, p. 38/223). Marshal Turner did not participate in that investigation (Doc. 11-2, p. 38/223).

### 2.   Officer Collins

Officer Nickeo Collins of the Natchitoches Police Department (and commander of the Natchitoches drug task force) also testified (Doc. 11-2, p. 53/223). Collins

testified that the USMS asked him for assistance in locating Small in the Natchitoches area (Doc. 11-2, p. 54/223).  The marshals met with Collins to formulate a plan to apprehend Small as quickly and safely as possible (Doc. 11-2, pp. 55, 57/223).

Officer Collins testified that he participated in the apprehension (Doc. 11-2, p. 57/223).  Collins was in an unmarked white pickup (Ford F150) that was parked beside nearby trailers (Doc. 11-2, pp. 57-58/223).  Collins watched Small exit the apartment building and quickly get into his car and pull out (Doc. 11-2, p. 59/223).  Collins saw Small's vehicle approach the intersection where the task force vehicles converged, lights on, to stop Small (Doc. 11-2, p. 59/223).  The white pickup was approaching the scene from behind Small and stopped in the road (Doc. 11-2, p. 60/223). Collins saw Small's car stop, and the officers exited their vehicles and began pointing and yelling at Small (Doc. 11-2, p. 60/223).  Small then began to drive in reverse, at about 40 mph and accelerating, until it hit the pickup Collins was riding in (Doc. 11-2, pp. 60, 71/223).  Collins suffered a laceration to the right side of his face when Small's vehicle hit the white pickup Collins was riding in (Doc. 11-2, pp. 67-68/223).

Collins and the other officers exited the pickup (Doc. 11-2, p. 60/223).  Collins saw Small's vehicle lurching forward and backwards, trying to dislodge itself from the truck (Doc. 11-2, p. 57/223).  Collins was standing behind Small's car, and could see Small because the rear window was broken out (Doc. 11-2, p. 61/223).  Collins also saw officers trying to break out one of Small's windows (Doc. 11-2, p. 61/223).  Collins explained that, if they could break out a window, they would be able to reach in and

stop Small (Doc. 11-2, pp. 61-62/223). They wanted to stop Small because he still had control of his vehicle, which was a threat to them all (Doc. 11-2, p. 62/223). Someone then fired a shot (Doc. 11-2, p. 62/223). Collins did not know whether Small or an agent had fired the shot (Doc. 11-2, p. 62/223). Then there was another shot, then a brief pause, and Small's vehicle pried itself loose from the truck (Doc. 11-2, p. 62/223). The agents dove out of the way of Small's vehicle and Small sped off, going around the right side of the vehicle that was blocking it (Doc. 11-2, p. 62/223). As Small drove away, Collins, Deputy Marshal Belgard, and Deputy Jenkins got back into the white pickup truck and began following Small (Doc. 11-2, p. 62/223). The other agents were out of position to follow quickly (Doc. 11-2, p. 62/223).

Collins testified they followed Small as he drove toward an intersection (Doc. 11-2, p. 62/223). Collins told the driver they should try to stop him because he would hurt someone if he got to the intersection (Doc. 11-2, p. 63/223). As Small began to turn onto another street, the pickup truck bumped the back end of Small's car, causing it to spin around and lodge the front of the car against the driver's side of the truck (Doc. 11-2, p. 63/223). Collins and Belgard exited the truck, but the driver was unable to get out (Doc. 11-2, p. 63/223). Concerned that, if armed, Small would be able to shoot Jenkins in the truck, Collins and Belgard rushed to cover Small with their weapons and order him to put his hands up (Doc. 11-2, p. 63/223). Small did not comply with their orders, and was instead "moving and doing different things" (Doc. 11-2, p. 63/223). As the other task force units began to arrive, Collins moved to the passenger side of Small's car while Belgard moved toward the broken rear window

8

and pulled out his taser (Doc. 11-2, p. 63/223).  The arriving officers also began to order Small to show his hands and get out of the car, while providing lethal cover for Belgard (Doc. 11-2, p. 63/223).  Small still did not cooperate (Doc. 11-2, p. 63/223).  As Marshal Belgard tased Small, another agent was able to break the glass, open the car door, pull Small out of the car, and handcuff him (Doc. 11-2, p. 63/223).  Collins did not participate in the criminal investigation of the incident (Doc. 11-2, p. 68/223).

### 3. Deputy Sheriff Jenkins

Rapides Parish Sheriff's Deputy Sergeant Jason Jenkins testified that he was attached to the USMS violent offender task force and participated in arresting Small (Doc. 11-2, p. 80/223).  Jenkins drove the white pickup truck (Doc. 11-2, pp. 80-81/223).  When he was alerted that Small was driving his car (above the posted speed limit), Jenkins drove onto the street behind it and tried to catch up to it (Doc. 11-2, p. 84/223).  When Small's car approached the intersection, the other vehicles (that were semi-marked and using their lights) initiated a traffic stop at the intersection (Doc. 11-2, p. 85/223).  When the agents exited their vehicles, Small slammed on his brakes (the nose of the car went down and the trunk went up), then began driving in reverse (Doc. 11-2, p. 85/223).

Jenkins testified his truck was going to be the rear "pinch vehicle" to block Small in (Doc. 11-2, p. 86/223).  When Jenkins saw Small driving backwards towards him, he immediately came to a complete stop with his blue emergency lights activated (Doc. 11-2, p. 86/223).  Small then rammed into Jenkins's truck, causing Jenkins to hit his head on the sun visor area (Doc. 11-2, p. 86/223).  Jenkins suffered a large

contusion on his head and a broken right hand (Doc. 11-2, p. 89/223). The officers exited the truck and Jenkins and Officer Rollins went to Small's driver's window and instructed him to show his hands, unlock his car, and get out of his car (Doc. 11-2, p. 86/223). Rollins began to try to break the driver's window (Doc. 11-2, pp. 86, 90/223). Jenkins testified that he holstered his gun and pulled out his taser because it was less lethal (Doc. 11-2, p. 87/223).

Jenkins testified that, the entire time, Small continuously rocked his car forward and backwards to try to free it from the truck (Doc. 11-2, p. 87/223). Jenkins decided to return to his truck (Doc. 11-2, p. 87/223). He heard shots fired and saw Small driving away (Doc. 11-2, p. 87/223). Jenkins initially had difficulty getting his truck going, but was able to drive after Small (Doc. 11-2, p. 87/223). Lt. Collins and Deputy Marshal Belgard jumped in the truck with him as he took off (Doc. 11-2, p. 87/223).

Jenkins testified that both cars were somewhat disabled (Doc. 11-2, p. 88/223). Jenkins was unable to keep up with Small until Small slowed down to weave in and out of oncoming traffic (Doc. 11-2, p. 87/223). Jenkins was aware of the dangerous intersection coming up and the rush-hour traffic, and realized Small was about to endanger people (Doc. 11-2, p. 88/223). Jenkins "got enough speed" in a sharp curve to do a "pit maneuver"–he bumped Small's rear quarter panel on the driver's side and Small spun around in front of him (Doc. 11-2, pp. 88-89/223). Jenkins's truck turned into the Small's driver's door and the two vehicles stopped with the truck's front bumper in the car's front driver's side fender well (Doc. 11-2, p. 89/223). Belgard and

10

Collins exited the pickup, other officers arrived, and Jenkins was able to leave the truck through the passenger's side door (Doc. 11-2, p. 89/223). Jenkins went to stand in front of the car as the taser was deployed, then helped handcuff Small (Doc. 11-2, p. 89/223).

### 4.   Deputy Sheriff Rollins

Rapides Parish Sheriff's Deputy Jerry Rollins testified that he is with the USMS violent offender task force and participated in the arrest of Small (Doc. 11-2, p. 109/223). Rollins rode in Jenkins's white pickup truck, in the rear driver's side seat (Doc. 11-2, p. 111/223). Rollins testified that, when the agents blocked Small's access to the intersection with their vehicles, Small stopped and then started driving in reverse at a high rate of speed (Doc. 11-2, p. 112/223). Rollins testified they did not have time to get out of Small's way, so Small struck their truck hard (Doc. 11-2, p. 112/223).

Rollins testified that he exited the truck and ran to the driver's side of Small's car, tried to unlock it, and yelled at him to show his hands (Doc. 11-2, p. 112/223). Although the car had darkly tinted glass, Rollins could see Small had one hand on the wheel and one hand on the stick shift (Doc. 11-2, pp. 112-13/223). Small seemed to have difficulty shifting his gears (Doc. 11-2, p. 113/223). At one point, Small looked at Rollins, lifted his hands briefly, then put them down again (Doc. 11-2, p. 113/223). Small's tires were spinning backwards but the car was not moving (Doc. 11-2, p. 113/223). Rollins had his M4 rifle with him with the flash pressed on it (Doc. 11-2, p. 113/223). Although Rollins did not have a glass tool on his rifle, he steadily

hammered the window to break it, so he could deploy his taser (Doc. 11-2, p. 113/223). However, the window did not break (Doc. 11-2, p. 113/223).

Eventually, Small put his car in drive, the tires squealed, and the vehicle took off (Doc. 11-2, p. 113/223). As Small's car moved to the left, Rollins could hear several pops, so he turned and went to the right, away from the car (Doc. 11-2, p. 113/223). The pickup truck pursued Small's car and Rollins was left behind (Doc. 11-2, p. 113/223). Rollins got in another vehicle and arrived at the second crash site in time to hear the taser being deployed, and to see Small being pulled from the car and cuffed on the ground (Doc. 11-2, pp. 113-14/223). Rollins testified that the pickup had its blue lights on at the second crash site (Doc. 11-2, p. 114/223).

### 5. Officer Connell

Natchitoches City Police Detective William Connell testified that he investigated the arrest of Small after it occurred, and did not participate in his apprehension (Doc. 11-2, p. 117/223). Detective Connell searched Small's car and found three spent rounds and one unspent .45 caliber round in the trunk (Doc. 11-2, pp. 123-24/223). A bullet from an AR15 hit Small in the leg (Doc. 11-2, p. 132/223). Connell also measured and found Small had travelled 50 yards when he drove backwards into the pickup truck (Doc. 11-2, p. 125/223).

### 6. Probation and Parole Officer Rachal

Louisiana Probation and Parole Officer Murphy Rachal also participated in the task force that apprehended Small (Doc. 11-2, p. 134/223). Officer Rachal testified that he rode in Deputy Marshal Turner's vehicle (Doc. 11-2, p. 135/223). Deputy

Marshal Turner stopped his vehicle in the intersection to block Small (Doc. 11-2, p. 135/223). When Small stopped his car in front of them, they jumped out of their cars and ran up to his car with their weapons drawn, giving verbal commands to turn off his car and get out of it (Doc. 11-2, p. 135/223). Small began driving in reverse at a high rate of speed until he crashed into Deputy Jenkins's pickup truck (Doc. 11-2, pp. 135, 147/223).

Officer Rachal testified that the crash was very hard and caused a lot of damage to both vehicles (Doc. 11-2, p. 137/223). Rachal ran to the front of the truck with his weapon drawn, ordering Small to get out of the car (Doc. 11-2, p. 137/223). Rachal could hear Small's car engine revving and saw his tires spinning in reverse (Doc. 11-2, p. 144/223). They could not see what Small was doing inside the car but he was moving around and the car was "gunning and revving," "up and drop-down" (Doc. 11-2, p. 137/223). Rachal heard someone yell "crossfire" so he moved to the driver's side of the car, at the driver's window, next to Deputy Rollins (Doc. 11-2, pp. 137, 145/223). Small's car kept rocking and revving, so Deputy Rollins tried to break the driver's window (Doc. 11-2, pp. 137, 146/223). Small kept rolling his wheels until the cars came apart, with officers in front of the car and beside it (Doc. 11-2, p. 138/223). Officer Rachal saw other weapons drawn and heard shots going off around him (Doc. 11-2, pp. 139, 143/223).

Rachal had a clear shot and fired his weapon once at Small to try to prevent him from running over the officers in front of his car (Doc. 11-2, p. 138/223). Rachal was standing next to the driver's door when he discharged his gun at Small through

13

the driver's side window (Doc. 11-2, p. 138/223). Officer Rachal testified he did not fire again because the window had cracked and he could no longer see anything through it (Doc. 11-2, pp. 138, 148/223). Officer Rachal thought he had hit Small (Doc. 11-2, p. 138/223). Rachal explained that he fired his gun because he thought Small was about to hurt or kill the officers around the vehicles (Doc. 11-2, p. 139/223). Small had not done anything up to that point that would lead Officer Rachal to believe he was about to surrender (Doc. 11-2, p. 139/223).

When Small drove away, Deputy Jenkins drove his truck in pursuit and Rachal got into Deputy Marshal Turner's vehicle (Doc. 11-2, p. 138/223). When they arrived at the second crash site, Officer Rachal went up to the pickup truck in time to hear Deputy Marshal Belgard's taser deploy (Doc. 11-2, p. 139/223). Rachal went to the car, saw the taser had made contact and Small was compliant, so they opened the passenger side door, removed Small from car, put him on the ground, and cuffed him (Doc. 11-2, p. 139/223). Small was then given medical assistance from Officer John Boone, a medic (Doc. 11-2, p. 139/223).

### 7. Deputy Marshal Cahn

United States Deputy Marshal Abry Cahn testified he participated in Small's apprehension (Doc. 11-2, p. 150/223). Deputy Marshal Cahn rode with Justin McDonnell in a vehicle driven by Jeremy Kennedy (Doc. 11-2, p. 150/223). Deputy Marshal Cahn testified they tried to stop and apprehend Small in a populated area (Doc. 11-2, p. 150/223). They were in unmarked vehicles and wore ballistic vests with visible markings on the front and back (a USMS patch on the front and "police" across

the back) (Doc. 11-2, p. 151/223).    As Small approached the intersection, the task force pulled their cars across it in front of Small (Doc. 11-2, p. 152/223).  Small skidded to a stop, and the officers exited their vehicles and started approaching Small's car, giving verbal commands with weapons drawn (Doc. 11-2, p. 152/223).  Small made eye contact, his eyes "got big," then he put his vehicle in reverse and started backing up at a high rate of speed (Doc. 11-2, p. 152/223).  Small traveled backwards about 50 yards and hit the trailing vehicle driven by Deputy Jenkins (Doc. 11-2, p. 153/223).  Small made no effort to try to avoid hitting the pickup (Doc. 11-2, pp. 161-62).  Deputy Marshal Cahn testified it was a serious crash and they ran to catch up to Small's and Jenkins's vehicles (Doc. 11-2, p. 153/223).

Deputy Marshal Cahn testified that he saw Small reach up and pull the gear shift down (Doc. 11-2, p. 153/223).  Small stomped on the gas pedal, the tires were spinning, and Officer Rollins tried to break through the window glass (Doc. 11-2, p. 153/223).  Small's car began to pitch more and more, making Cahn afraid it would get loose and seriously injure or kill one of the officers around it (Doc. 11-2, p. 154/223).  Cahn had an AR-15 long gun (Doc. 11-2, pp. 160-61/223).  Cahn testified he decided to fire into the vehicle in a downward direction, to keep the round in the car and to try to avoid ricochet (Doc. 11-2, p. 154/223).  Cahn fired, heard other gunfire, then Small's car jumped loose and lurched, so Cahn fired on more round into the car (Doc. 11-2, p. 154/223).  It took about 30 seconds for Small's car to break loose from the pickup truck (Doc. 11-2, pp. 164/223).

15

Small's car began to fishtail wildly going up the street and into a vacant lot, and finally crossed over the street and went across the highway into the ditch (Doc. 11-2, p. 154/223). Small then gained control of the car, got it back onto the road, and drove away with Officer Jenkins's pickup behind it (Doc. 11-2, p. 154/223). The other officers' vehicles also followed with their blue lights on (Doc. 11-2, p. 154/223).

Deputy Marshal Cahn car was behind Jenkins's pickup and saw Jenkins execute the pit maneuver (Doc. 11-2, p. 155/223). Small's car and the pickup stopped, wedged together door-to-door (Doc. 11-2, p. 155/223). Cahn and the other officers went to Small's car with guns drawn, and ordered Small to show his hands and turn off his car (Doc. 11-2, p. 155/223). Small continued to stomp the gas to try to pull his car away, all the while with his hands up as though he was compliant (Doc. 11-2, pp. 155, 168/223). Cahn testified there was no compliance by Small, and he continued to try to get away (Doc. 11-2, p. 155/223).

Small then "floor-boarded" his car (Doc. 11-2, p. 155/223). Small's vehicle did not go anywhere because the car and the pickup were jammed in and sandwiched door-to-door, and Small's car had a tremendous amount of damage to the back of it (Doc. 11-2, p. 156/223). Deputy Marshal Cahn could not fire into the car because Jenkins's pickup was on the other side of the car (Doc. 11-2, p. 155/223). At that point, Deputy Marshal Belgard successfully deployed a taser through the back window (Doc. 11-2, pp. 155-56/223).

Cahn stated in his incident report that Small had raised his hands but was still pressing the accelerator when Deputy Marshal Belgard deployed a taser on Small (Doc. 11-2, p. 168/223).

The other officers opened Small's car door, extracted Small, and put him into custody (Doc. 11-2, p. 155/223). Small had a gunshot wound to his upper thigh that did not appear to be very serious (there was not a lot of blood), so Officer Boone, a paramedic, began to treat his wound (Doc. 11-2, p. 156/223).

Deputy Marshal Cahn testified that, although Small's car windows were tinted very dark, he was able to see Small because the front passenger window had been knocked out (Doc. 11-2, p. 158/223). Cahn knew Small was constantly pushing the gas pedal because he could see the tires were spinning and hear the acceleration (Doc. 11-2, p. 158/223). Cahn testified that Small was shot in his right thigh, but was able to push down on the gas pedal because his adrenalin was up (Doc. 11-2, p. 158/223).

### 8.    Officer Ardoin

Shreveport Police Department Officer Eric Ardoin testified that he was assigned to the USMS violent offender task force and assisted in Small's apprehension (Doc. 11-2, pp. 168-69/223). Officer Ardoin drove an unmarked vehicle that had its lights on (Doc. 11-2, p. 169/223). Officers Jack Gray and T.C. Bloxom rode with Ardoin (Doc. 11-2, p. 169/223).

When Ardoin arrived at the intersection, the blockade was set up and Ardoin saw Small's car backing at a high rate of speed for up about 50 yards until it hit Turner's pickup truck (Doc. 11-2, p. 168/223). Since those in Ardoin's vehicle did not

17

exit at the vehicle at the intersection blockade, they drove to the first crash site (Doc. 11-2, p. 171/223). Ardoin stood in front of Small's vehicle and saw the tires repeatedly spinning forward then backward while Small accelerated (Doc. 11-2, p. 172/223). (Doc. 11-2, p. 172/223). Small's vehicle was "kind of jumping" but was hooked up to the truck's bumper (Doc. 11-2, p. 172/223). Everyone was giving Small verbal commands to show his hands, stop, and get out of his car (Doc. 11-2, p. 172/223). Small's tires billowed smoke, the car began to skip like it was about to break loose, and Ardoin worried about being run over or pinned to the vehicle behind him (Doc. 11-2, pp. 172-73/223). Ardoin testified he was in fear for his life, so he fired a shot at "the threat" (Small) through the front windshield to prevent Small from killing anyone (Doc. 11-2, p. 173/223). Ardoin only fired once (Doc. 11-2, p. 179/223).

After the shots were fired, the officers dove out of Small's way as his car broke loose and took off (Doc. 11-2, p. 174/223). The pickup truck pursued Small, and Ardoin's vehicle followed the pickup (Doc. 11-2, p. 175/223). Small's car negotiated around oncoming traffic as he drove away (Doc. 11-2, p. 172/223). After Jenkins's pickup stopped Small with a pit maneuver, Ardoin ran to the passenger side of Small's car (Doc. 11-2, p. 175/223). Ardoin testified that Small was still trying to get his car to go, and the tires were spinning a little bit, making a lot of racket, but Small still would not comply with verbal commands (Doc. 11-2, p. 175/223).

Marshal Belgard fired a taser through Small's back windshield and was able to gain compliance from Small (Doc. 11-2, p. 175/223). Ardoin was able to reach in, unlock the passenger door, open it, and pull Small out of the vehicle (Doc. 11-2, p.

175/223). Small was then handcuffed and given medical attention for the gunshot wound on his leg (Doc. 11-2, p. 175/223).

### 9.    Deputy Sheriff McDonnell

Caddo Parish Sheriff's Deputy Justin McDonnell testified that he was assigned to the violent offender task force and participated in apprehending Small (Doc. 11-2, p. 180/223). McDonnell rode in Cahn's vehicle (Doc. 11-2, p. 180/223). McDonnell testified that task force vehicles blockaded Small's car with their blue lights on (Doc. 11-2, p. 182/223). Small saw the blockade and reversed his car, driving backwards until he crashed into the pickup truck (Doc. 11-2, p. 182/223). Small made no attempt to stoop or avoid the pickup (Doc. 11-2, p. 187/223). Small then ignored the commands to show his hands and stop, put his car in drive, spun the front tires and turned them side to side, and jerked the car side to side in an effort to loosen it from the truck (Doc. 11-2, p. 183/223). When someone said "crossfire," they all tried to go to the driver's side of the vehicle (Doc. 11-2, p. 184/223). Ardoin stood at the driver's door (Doc. 11-2, p. 184/223).

Ardoin testified the tires continued to spin and turn side to side, and he feared the vehicle would run over someone (Doc. 11-2, p. 184/223). Ardoin fired two shots into Small's car with his .40 caliber Glock 23 (Doc. 11-2, p. 184/223). Ardoin then backed away from the vehicle to a safe area, the car broke free from the truck and traveled through the intersection into a grassy area on the other side, then turned left and returned to the road (Doc. 11-2, p. 185/223). Ardoin returned to his vehicle

and followed Small (Doc. 11-2, p. 185/223). Small was stopped in the middle of the road and taken into custody (Doc. 11-2, p. 185/223).

### 10.    Officer Kennedy

Bossier City Police Officer Jeremy Kennedy testified that he is assigned to the USMS violent offender task force and participated in the apprehension of Small (Doc. 11-2, p. 188/223). Officer Kennedy drove an unmarked vehicle with blue lights (Doc. 11-2, p. 189/223). Kennedy pulled the vehicle in to blockade Small, and the officers exited the car and identified themselves (Doc. 11-2, p. 189/223). Small then began driving backwards until he hit the surveillance team pickup truck (Doc. 11-2, p. 190/223). Kennedy and the other officers ran to the crash site, where Small's car was hung up on the back of the truck (Doc. 11-2, p. 191/223). They took an "L" formation around the car and ordered Small to turn the car off and show his hands (Doc. 11-2, p. 191/223).

Small's front tires continued to spin and his car pitched (Doc. 11-2, p. 191/223). Then Small's car was off the truck and pitched in the officers' direction, and shots were fired (Doc. 11-2, pp. 191-192/223). Ardoin did not fire his gun, but got out of the way (Doc. 11-2, p. 192/223). When Ardoin turned around, Small was driving through grass, then returned to the road and drove back toward town (Doc. 11-2, p. 192/223).

Officer Kennedy testified that he drove after Small, and saw Small stopped by the pickup Doc. 11-2, p. 192/223). Officers surrounded Small's car again (Doc. 11-2, p. 192/223). Small's tires kept spinning but the car was not moving (Doc. 11-2, p. 193/223). Deputy Marshal Belgard tased Small through the broken back windshield

(Doc. 11-2, p. 193/223).  Small was then removed from the car (Doc. 11-2, p. 193/223). Since Small was injured, they called for an ambulance, treated him, and sent him to a hospital (Doc. 11-2, p. 193/223).

### 11.    Officer Boone

Louisiana Probation and Parole Officer John Boone testified that he is assigned to the USMS violent offender task force and participated in apprehending Small (Doc. 11-2, p. 197/223).  Boone is also a paramedic (Doc. 11-2, p. 198/223). Boone testified that, after Small drove up to the road block, they exited their vehicles, identified themselves as police, and told him to show his hands (Doc. 11-2, p. 198/223). Small looked at the officers and, right after they exited their vehicles, he drove backwards fast (Doc. 11-2, p. 198/223).  Small's car struck the pickup driven by Deputy Jenkins with a great deal of force (Doc. 11-2, p. 199/223).

The car and truck were stuck together after the crash, but Small tried to unhook his car by putting it in forward gear and accelerating, spinning and smoking the front wheels (Doc. 11-2, p. 199/223).  Small also put the car in reverse and spun the wheels the other way a couple of times (Doc. 11-2, p. 199/223).  Small's car broke free of the truck and shots were fired into the vehicle (Doc. 11-2, p. 199/223).  Boone did not fire any shots (Doc. 11-2, p. 199/223).  Small drove away and ran off the road a few times, but regained it and Jenkins's truck followed (Doc. 11-2, p. 199/223). Boone caught up after Small had been stopped, tased, and removed from the car (Doc. 11-2, p. 203/223).

Boone treated Small's leg wound (Doc. 11-2, p. 200/223).  Only the top of Small's leg had been hit and it did not appear to be life-threatening (Doc. 11-2, p. 200/223).  Boone also treated a laceration on Collins's lip and Jenkins's hand (which was fractured) (Doc. 11-2, p. 201/223).

### 12.   Deputy Marshal Belgard

USMS Deputy Marshal Glen Belgard testified that he was the violent offender task force coordinator and team leader (Doc. 11-2, p. 204/223).  Belgard testified that he had been contacted by his supervisor about a Texas felony warrant involving a violent offense (Doc. 11-2, p. 205/223).  There were three apprehension (takedown) teams, three separate vehicles, and a surveillance unit driven by Deputy Jenkins (Doc. 11-2, p. 205/223).  Belgard was in the surveillance vehicle with Jenkins (Doc. 11-2, p. 205/223).

The officers at the blockade all wore a highly marked, highly visible ballistic vests (Doc. 11-2, p. 208/223).  They identified themselves as police and gave Small direct, simple commands (Doc. 11-2, p. 209/223).  Belgard testified they try to avoid a gun fight and take violent fugitives into custody as safely as possible (Doc. 11-2, p. 2094/223).

Belgard testified that Deputy Jenkins's truck trailed behind Small because Small was speeding through a heavily populated neighborhood with a lot of pedestrians (Doc. 11-2, p. 207/223).  As Small approached the blockade, the police vehicle turned on their lights and Small stopped his car (Doc. 11-2, p. 208/223).  The

officers exited their vehicles with their weapons drawn, and Small immediately drove backward at a high rate of speed (Doc. 11-2, p. 208/223).

Belgard testified that Jenkins stopped his truck and Small hit it at about 45 mph (Doc. 11-2, p. 210/223). Belgard recalled Small's rear window glass hitting the truck's windshield and flying over the cab (Doc. 11-2, p. 210/223). The officers exited their vehicles and surrounded Small's car, identifying themselves as police, and yelling at Small to put his hands up and stop his car (Doc. 11-2, p. 210/223). Belgard saw the crossfire situation and went to the back of truck (Doc. 11-2, p. 221/223). Belgard testified that Small threw his hands up "for a while," but stepped on the accelerator again, spinning the front tires and throwing the car into reverse, rocking it back and forth (Doc. 11-2, pp. 210-11/223). Small went back and forth, rocking his car, until it finally dislodged from the truck (Doc. 11-2, p. 211/223). When Small broke loose, shots were fired (Doc. 11-2, p. 211/223). Belgard did not fire any shots (Doc. 11-2, p. 21/223).

Belgard testified he believed Small was badly wounded because his car seat was laid back and he did not speed away, but left slowly, swerving off the road and across it (Doc. 11-2, p. 211/223). Small finally accelerated again and took off down the road (Doc. 11-2, p. 211/223). Belgard and Collins returned to Jenkins's truck and caught up with Small, who was swerving all over the road into oncoming traffic (Doc. 11-2, pp. 211-12/223). Belgard told Jenkins they needed to stop Small before they entered the more populated areas of town, so Jenkins successfully performed a pit

("Pursuit Intervention Technique") maneuver in an industrial area (Doc. 11-2, p. 212/223).  The vehicles came to rest side-by-side (Doc. 11-2, p. 212/223).

Belgard testified that he exited the truck with his rifle, other officers arrived, and they started giving Small orders (Doc. 11-2, p. 212/223).  Small was still trying to accelerate and get away (Doc. 11-2, p. 212/223).  Small raised his hands and stomped on the accelerator, then his hands went down where Belgard could not see them (Doc. 11-2, p. 212/223).  Belgard put down his rifle, pulled out his taser, and deployed a shot sideways through the (missing) rear window so it would hit both of Small's shoulder blades, to cause a muscular disruption incapacitation (he would not be able to move) (Doc. 11-2, pp. 212-13/223).  Small was then taken into custody and the paramedic treated Small, as well as the injured officers (Jenkins and Collins) (Doc. 11-2, p. 212/223).

## II.    Law and Analysis

### A.    The Court has subject matter jurisdiction over Small's excessive force claims.

#### 1.    Sovereign Immunity under the Eleventh Amendment.

Initially, it is noted that neither party to this suit addressed the issue of the Court's subject matter jurisdiction.[3]  Instead, Defendant raised only a Rule 12(b)(6) Motion to Dismiss pursuant to Heck v. Humphrey, 512 U.S. 477, 488-489 (1994).

---

[3] Heck v. Humphrey does not address the Court's jurisdiction.  Instead, the Heck Court held that, in order to recover damages for harm caused by actions whose unlawfulness would render a conviction or sentence invalid, the plaintiff must first prove the conviction or sentence has been reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus.  Until that has been done, no cause of action exists.  See Heck v. Humphrey, 512 U.S. 477, 488-489 (1994).  Therefore, Heck does not hold the court lacks subject matter jurisdiction over such a case, but rather "den[ies] the existence of a cause of action."  See Heck, 512 U.S. at 488-489.

Because absolute immunity is properly viewed as "*immunity from suit* rather than a mere defense to liability," it is appropriate for a district court to resolve the question of absolute immunity before reaching the Heck analysis when feasible.  Boyd v. Biggers, 31 F.3d 279, 284 (5th Cir. 1994) (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (2006).  If a defendant is dismissed on absolute immunity grounds, it becomes clear that the § 1983 plaintiff will never have a claim against that defendant based on the particular facts alleged, even if the plaintiff is a state prisoner who eventually satisfies the precondition to a valid § 1983 claim under Heck.  This approach best serves the purposes underlying the absolute immunity doctrine.  See Boyd, 31 F.3d at 284.

Federal courts are courts of limited jurisdiction, having only the authority endowed by the Constitution and conferred by Congress.  See Halmekangas v. State Farm Fire and Cas. Co., 603 F.3d 290, 292 (5th Cir. 2010).  As such, the existence of subject matter jurisdiction may be challenged at any stage in the litigation and may be raised by the district court on its own motion.  See Nguyen v. Dist. Director, Bureau of Immigration and Customs Enforcement, 400 F.3d 255, 260 (5th Cir. 2005).  Subject-matter jurisdiction can never be waived or forfeited.  See Gonzalez v. Thaler, 565 U.S. 134, 141 (2012); see also Jackson v. FIE Corp., 302 F.3d 515, 525 (5th Cir. 2002) (objections to subject-matter jurisdiction cannot be waived).  Judgments made by a district court without subject matter jurisdiction are void.  See Brumfield v. La. State Bd. of Education, 806 F.3d 289, 298 (5th Cir. 2015) (citing Williams v. New Orleans Pub. Serv., Inc., 728 F.2d 730, 735 (5th Cir. 1984)).

Under Fed. R. Civ. P. rule 12(h)(3), this Court *sua sponte* may raise the issue of its subject matter jurisdiction. See Burge v. Par. of St. Tammany, 187 F.3d 452, 465–66 (5th Cir. 1999). Eleventh Amendment immunity is a jurisdictional issue, and it is appropriate for this Court to raise it on its own motion, if necessary. See Perez v. Region 20 Education Service Ctr., 307 F.3d 318, 333 n. 8 (5th Cir. 2002); see also Lower Colorado River Auth. v. Papalote Creek II, L.L.C., 858 F.3d 916, 927 (5th Cir. 2017), cert. denied, 138 S. Ct. 747 (U.S. 2018) (citing Raj v. Louisiana State Univ., 714 F.3d 322, 329 (5th Cir. 2013)); Burge, 187 F.3d at 465–66.

Jurisdictional challenges should be considered before addressing any attack on the merits. See Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001).

### 2. The FTCA waiver of sovereign immunity and its limitations.

The FTCA waives the government's sovereign immunity and permits suit against it for certain tort claims "in the same manner and to the same extent as a private individual under like circumstances." See 28 U.S.C. § 2674; Campos v. United States, 888 F.3d 724, 730–31 (5th Cir. 2018), pet. for cert. filed (8/22/2018). The FTCA also provides federal district courts with exclusive jurisdiction over monetary damage claims against the government for "personal injury ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." See § 1346(b)(1); Campos, 888 F.3d at 730.

The government's liability for such claims is not absolute. Section 2680 of the FTCA outlines exceptions that block the FTCA's waiver of the government's sovereign immunity. See Campos, 888 F.3d at 730–31. If an exception applies, a plaintiff's

FTCA claim is barred, and a federal court is without subject matter jurisdiction over the claim. See Campos, 888 F.3d at 730–31.

Two subsections of § 2680 are relevant in this case. One is § 2680(a), commonly referred to as the "discretionary function exception," which excepts any claim that is based upon a government employee's performance of a "discretionary function or duty ... whether or not the discretion involved be abused." See Campos, 888 F.3d at 730–31. The other is § 2680(h). It excepts from the waiver of immunity certain tort claims, including false arrest and false imprisonment, committed by a government investigative or law enforcement officer. See Campos, 888 F.3d at 730–31. Section 2680(h), though, does allow suits based on "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." See 28 U.S.C. § 2680(h); Campos, 888 F.3d at 730–31. This second quoted portion of § 2680(h) is often labeled the "law enforcement proviso." See Campos, 888 F.3d at 730–31 (citing Tsolmon v. United States, 841 F.3d 378, 381 (5th Cir. 2016)).

Neither the discretionary function exception nor the law enforcement proviso "exist[s] independently of the other nor does one predominate over the other." Campos, 888 F.3d at 730-31 (quoting Sutton v. United States, 819 F.2d 1289, 1295 (5th Cir. 1987)). The circumstances in which either the discretionary function exception or the law enforcement proviso governs to the exclusion of the other are decided on a case-by-case basis. See Campos, 888 F.3d at 730–31 (citing Sutton, 819 F.2d at 1298). In the Fifth Circuit, the proviso and the discretionary function

exception each have to be considered.  See Campos, 888 F.3d at 735.  Both the proviso and the discretionary function exception must be read together.  See Campos, 888 F.3d at 737 (citing Sutton, 819 F.2d at 1295).  In other words, one does not moot the other when both cover a fact pattern.  See Campos, 888 F.3d at 737 (citing Sutton, 819 F.2d at 1297).

To determine whether the plaintiff can establish the government's liability under the FTCA, courts look to the "law of the place where the act or omission occurred."  See Calderon–Ortega v. United States, 753 F.3d 250, 252 (1st Cir. 2014) (quoting 28 U.S.C. § 1346(b)(1)).

### 3.  The discretionary function exception to liability applies to Small's claims.

The discretionary function exception preserves the government's sovereign immunity when the plaintiff's claim is based on an act by a government employee that falls within that employee's discretionary authority.  See 28 U.S.C. § 2680(a).  Whether an official's actions fall within the exception involves two inquiries: (1) the conduct must be a matter of choice for the acting employee; and (2) the judgment must be of the kind that the discretionary function exception was designed to shield.  See Tsolmon, 841 F.3d at 382 (citing Spotts v. United States, 613 F.3d 559, 567 (5th Cir. 2010).  The purpose of the discretionary-function exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.  See United States v. Gaubert, 499 U.S. 315, 323 (1991).  Thus, when properly construed, the

discretionary-function exception protects only governmental actions and decisions based on considerations of public policy.  See Gaubert, 499 U.S. 315, 323.

Small's claim arises out of the manner in which the task force executed his arrest warrant.  Small claims the marshals intentionally used excessive and deadly force that resulted in physical and mental pain and suffering, and were negligent in pointing loaded firearms and a taser at Small after he had been secured.  Therefore, Small alleges both an intentional tort and negligence.

The enforcement of federal criminal statutes through the investigation and apprehension of suspected violators is generally viewed as being grounded in public policy.  See Hawkins v. United States, 1994 WL 802850, at *2 (W.D. Tex. 1994); McElroy v. United States, 861 F. Supp. 585, 592 (W.D. Tex. 1994); Mesa v. United States, 837 F. Supp. 1210, 1213 (S.D. Fla. 1993), aff'd, 123 F.3d 1425 (11th Cir. 1997) (the overwhelming consensus of federal case law establishes that criminal law enforcement decisions–investigative and prosecutorial alike–are discretionary in nature and, therefore, by Congressional mandate, immune from judicial review).  The Fifth Circuit has stated: "The federal government's decisions concerning enforcement of its criminal statutes comprise a part of its pursuit of national policy....  We emphasize that this discretion, exercised in even the lowliest and least consequential cases, can affect the policies, duties, and success of a function placed under the control of the Attorney General by our Constitution and statutes."  Smith v. United States, 375 F.2d 243, 247 (5th Cir.), cert. denied, 389 U.S. 841 (1967).

In <u>Campos</u>, 888 F.3d at 731, the United States Court of Appeals for the Fifth Circuit found the discretionary function exception applied to an FTCA action brought by a plaintiff who alleged she was falsely arrested and imprisoned by agents of the United States Immigration and Customs Enforcement ("ICE"). The Fifth Circuit explained that government officials do not have relevant discretion when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive. <u>See</u> <u>Campos</u>, 888 F.3d at 731 (citing <u>Gaubert</u>, 499 U.S. at 322). In other words, the discretionary function exception does not apply if the challenged actions in fact violated a statute, regulation, or policy. <u>See</u> <u>Campos</u>, 888 F.3d at 731 (citing <u>Spotts</u>, 613 F.3d at 567).

Therefore, there was a strong public policy interest in apprehending Small, wanted on a violent felony charge, and taking him to court to answer that charge. <u>See</u> <u>Hawkins</u>, 1994 WL 802850 at *2 (there is a strong public interest in in apprehending those charged with felony offenses and taking them to court to answer their charges).

In general, because it is the mandatory duty of law enforcement agents to enforce the law, decisions as to how to best fulfill that duty are protected by the discretionary function exception. <u>See</u> <u>McElroy</u>, 861 F. Supp. at 591 (citing <u>Horta v. Sullivan</u>, 4 F.3d 2, 21 (1st Cir. 1993)).

The testimony from Small's Louisiana state trial (Doc. 11-2) showed the planning, orchestration, and effectuation of Small's arrest involved elements of

judgment and choices by the task force: (1) the decision to create a road block to stop and arrest Small as efficiently as possible and minimizing the risk to other people; (2) the choices made in using a lethal defense (firearms) in attempting to prevent Small from using his car as a weapon against the agents after he freed his car from the pickup truck; (3) the decision to follow Small when he fled from the task force; (4) the decision to use a "pit maneuver" to prevent Small from entering a high-traffic intersection when he was driving on both sides of the road, weaving in and out of oncoming traffic; and (5) the choice to use non-lethal means (a taser) to force Small to comply with police orders to show his hands and exit his vehicle.  All of those were choices and decisions made in the heat of the moment in order to execute the arrest warrant for one charged with commission of a violent felony.

The actions of the task force agents in connection with arresting Small satisfy both prongs of the test for application of the discretionary function exception. Compare Hawkins, 1994 WL 802850, at *2.  Therefore, the discretionary function exception applies generally to shield the United States from tort liability for the task force officers' actions in arresting Small.

However, the law enforcement proviso to the intentional tort exception must also be considered.

### 4.   The law enforcement proviso applies to Small's excessive force claims.

The intentional tort exception states that sovereign immunity is not waived for "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or

31

interference with contract rights."  28 U.S.C. § 2680(h); see also Campos, 888 F.3d at 736.  The identified intentional torts are statutorily excepted from the FTCA unless the law enforcement proviso applies.  See Campos, 888 F.3d at 735.  Thus, under the FTCA as initially enacted, those intentional torts were not actionable against the United States.  See Campos, 888 F.3d at 736.

The law enforcement proviso "extends to acts or omissions of law enforcement officers that arise within the scope of their employment, regardless of whether the officers are engaged in investigative or law enforcement activity, or are executing a search, seizing evidence, or making an arrest."  See Campos, 888 F.3d at 737 (citing Millbrook v. United States, 569 U.S. 50, 57 (2018).  The criteria for application of the proviso are only: (1) that the defendant is an "investigative or law enforcement officer"; and (2) that acts or omissions of such an officer caused one of the six intentional torts (assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution) to be committed.  See Campos, 888 F.3d at 737 (citing Millbrook, 569 U.S. at 54-55); 28 U.S.C. § 2680(h).

Small contends the marshals: (1) intentionally used excessive and deadly force that resulted in physical and mental pain and suffering (they shot him in the leg when he tried to drive his car away from the site of the first stop, where he had crashed his car into the pickup truck); and (2) were negligent in pointing loaded firearms and a taser at Small after he had been secured, resulting in severe physical pain and suffering.  Small also alleges in his complaint that the torts he suffered are the fault of the "officers' negligent and unlawful operation of a substandard road block

and/or detention, seizure, and arrest." Small seeks damages for his injuries resulting from the officers' "tortious acts and omissions in operating the roadblock and/or detention and arrest." Small contends "he was shot in the leg while remaining inside his vehicle with both hands up. Then he was handcuffed. After being handcuffed, but still remaining in his vehicle, agents tased Plaintiff." Small contends there was no justification for the use of force. Small's claims are labeled "intentional use of force" and "negligence" (Doc. 1).

The claim of negligence is not included in the "law enforcement proviso" list because it is not an intentional tort. The law enforcement proviso does not apply to Small's negligence claim. Therefore, the discretionary function exception to liability applies to Small's negligence claim, and Defendant has sovereign immunity from Small's negligence claim. Small's negligence claim should be dismissed for lack of subject matter jurisdiction.

Small's claim that the officers used excessive and deadly force is also not specifically listed in the excepted intentional torts of the law enforcement proviso. However, the proviso includes assault and battery, which are the Louisiana law counterparts of a constitutional claim of "excessive force." Compare Holian v. United States, 2009 WL 2413979, * 4 (W.D. La. 2009) (battery and assault clearly arise out of Holian's claims for use of excessive force during his arrest). Therefore, Small's excessive force claim falls within the law enforcement proviso.

Accordingly, the Court has subject matter jurisdiction over Small's excessive force claims pursuant to the law enforcement proviso.

B.    <u>**Small's excessive force claim should be dismissed.**</u>

The government contends in its Motion to Dismiss (Doc.11) that Small's FTCA claims are an improper collateral attack on his criminal conviction for aggravated obstruction of a highway and should be dismissed pursuant to <u>Heck v. Humphrey</u>. The government argues that Small's allegations that he was not resisting arrest when he was tased and shot, and did not threaten any agent with deadly or other force, conflict with the findings inherent in his conviction.

Small argues that: (1) he has a direct appeal of his criminal conviction pending, so this case should be stayed pending the outcome of his appeal; (2) he should be granted time in which to conduct discovery; and (3) his claim is not barred by <u>Heck,</u> citing <u>Bush v. Strain</u> (Doc. 14).

### 1.    <u>The Court may properly consider the transcript of Small's criminal trial.</u>

Defendant submitted an excerpt from the transcript of Small's criminal trial with its Motion to Dismiss (Doc. 11-2).  Small objects to consideration of his criminal trial transcript as extrinsic evidence (Doc. 14).  Small argues that Defendant has not yet answered, discovery has not yet been conducted, and it is too early to convert the motion to one for summary judgment.

A court may grant a motion to dismiss for "failure to state a claim upon which relief can be granted" under Fed. R. Civ. P. 12(b)(6).  "[A] complaint will survive dismissal for failure to state a claim if it contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" <u>Legate v. Livingston</u>, 822 F.3d 207, 210 (5th Cir. 2016), cert. den., 137 S.Ct. 489 (2016) (quoting <u>Ashcroft</u>

v. Iqbal, 556 U.S. 662, 678 (2009)) (internal citation and quotation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  The court must view all well-pleaded facts in the light most favorable to the plaintiff.  See Yumilicious Franchise, L.L.C. v. Barrie, 819 F.3d 170, 174 (5th Cir. 2016).

Normally, in deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint.  However, courts may also consider matters of which they may take judicial notice.  See Fed. R. Evid. 201(f); Warden v. Barnett, 252 F.3d 1356, *1 at n.1 (5th Cir. 2001) (citing Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1018 (5th Cir. 1996)); see also In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1426 (3d Cir. 1997) (a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment).  Taking judicial notice of publicly filed court documents does not convert a motion to dismiss to one for summary judgment.  See Warden v. Barnett, 252 F.3d at *1, n.1 (citing Lovelace, 78 F.3d at 1017-18); see also Jacobs v. Bayha, 616 Fed. Appx. 507, 510 at n.3 (3d Cir. 2015) (on motion to dismiss, court took judicial notice of criminal trial transcripts and dismissed, pursuant to Heck, excessive force claims brought by a plaintiff convicted of assaulting two deputy marshals); Garrett v. Crawford, 2015 WL 13731371, *7 at n. 48 (W.D. Tex. 2015) (report and recommendation), adopted in pertinent part, 2016

WL 843391 (W.D. Tex. 2016) (plaintiff convicted of aggravated assault filed action alleging use of excessive force, the court took judicial notice of the indictment and judgment in conjunction with defendant's motion to dismiss pursuant to <u>Heck</u>).

Therefore, the transcript from Small's Louisiana criminal trial will be considered in conjunction with Defendant's motion to dismiss pursuant to <u>Heck</u>. Importantly, the Court considers the transcript to understand the facts underlying Small's conviction for purposes of its <u>Heck</u> analysis, not to resolve disputes of fact. As explained below, this distinction is crucial when applied to Small's excessive force claim. The Court need not resolve the merits of the claim using the trial transcript to conclude Small's claim is barred by <u>Heck</u>.

### 2.    <u>Small's FTCA claim necessarily impugns his conviction.</u>

Small alleges his FTCA claim is for the officers' use of excessive force during his arrest. The government argues that Small's excessive force claim necessarily impugns his conviction for aggravated obstruction of a highway, La. R.S. 15:96.

In order to recover damages for harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a plaintiff must prove the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of *habeas corpus*, 28 U.S.C. §2254. <u>See</u> <u>Boyd v. Biggers</u>, 31 F.3d 279, 282 (5th Cir. 1994) (citing <u>Heck</u>, 512 U.S. at 486-87). The Supreme Court has held the plaintiff has no cause of action unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant

of a writ of *habeas corpus*.  See Boyd, 31 F.3d at 282 (citing Heck, 512 U.S. at 486-87).  An action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated.  See Boyd, 31 F.3d at 282 (citing Heck, 512 U.S. at 489-90); see also McGrew v. Texas Bd. of Pardons, 47 F.3d 158, 161 (5th Cir. 1995); Arvie v. Broussard, 42 F.3d 249, 250 (5th Cir. 1994).  A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable.  See Boyd, 31 F.3d at 282.

The Fifth Circuit has made clear that a claim which does not imply the invalidity of an underlying conviction or sentence, and is not otherwise barred, does not violate the Heck favorable termination rule, and may proceed.  Smith v. Hood, 900 F.3d 180, 185 (5th Cir. 2018).  The court described this distinction as follows:

> However, "if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed in the absence of some other bar to the suit."  Heck, 512 U.S. at 487, 114 S. Ct. 2364.  Determining whether a particular claim is barred by Heck is "analytical and fact-intensive" and requires the court to consider the specifics of the individual claim.  Bush v. Strain, 513 F.3d 492, 497 (5th Cir. 2008).  We conduct this analysis by assessing whether a claim is "temporally and conceptually distinct" from the related conviction and sentence.  See, e.g., id. at 498.  We ask whether the claims are "necessarily inconsistent" with the conviction, or whether they can "coexist" with the conviction or sentence without "calling [it] into question."  Ballard, 444 F.3d at 400–01.  Claims that challenge conditions of confinement, but not the fact or length of the sentence, are not barred by Heck.

Id.

In Bush v. Strain, a plaintiff who had been convicted of resisting arrest filed a § 1983 suit to recover damages for use of excessive force in effecting her arrest.  See

37

Bush v. Strain, 513 F.3d 492 (5th Cir. 2008).   The Fifth Circuit noted that, under Heck, a plaintiff who has been convicted of a crime cannot recover damages for an alleged violation of his constitutional rights if that "violation arose from the same facts attendant to the charge for which he was convicted," until that conviction has been reversed, expunged, or declared invalid.  See Bush, 513 F.3d at 497 (citing Heck, 512 U.S. at 486-87).  Although the Heck principle applies to § 1983 excessive force claims, the determination of whether such claims are barred is analytical and fact-intensive, requiring the courts to focus on whether success on the excessive force claim requires negation of an element of the criminal offense or proof of a fact that is inherently inconsistent with one underlying the criminal conviction.  See Bush, 513 F.3d at 497.  An excessive force claim for damages would not necessarily imply the invalidity of a conviction if the factual basis for the conviction is temporally and conceptually distinct from the excessive force claim.  See Bush, 513 F.3d at 498; see also Ballard v. Burton, 444 F.3d 391 (5th Cir. 2006).

However, Bush did not involve an aggravated assault with a deadly weapon. A moving vehicle can be considered a deadly weapon.  See Sanchez v. Tangipahoa Par. Sheriff's Office, 2010 WL 3720903, at *2 (E.D. La. 2010), aff'd sub nom., Sanchez v. Edwards, 433 Fed. Appx. 272 (5th Cir. 2011); see also Tolliver v. City of Chicago, 820 F.3d 237, 246 (7th Cir. 2016) (reasonable officers would have perceived the car as a deadly weapon); Terrell v. Smith, 668 F.3d 1244, 1255 (11th Cir. 2012) (a moving vehicle may be considered a deadly weapon, especially after the driver has been

repeated ordered to stop); United States v. Garcia, 868 F.2d 114, 115 (4th Cir. 1989), cert. den. 490 U.S. 1094 (1989) (a car can be used as a deadly weapon).

The Fifth circuit has recognized that, pursuant to Heck, certain convictions will prevent a plaintiff from bringing an excessive force claim.  See DeLeon v. City of Corpus Christi, 488 F.3d 649, 656-57 (5th Cir. 2006) (where plaintiff was convicted of aggravated assault on an officer, his claim of excessive force was dismissed pursuant to Heck); Arnold v. Town of Slaughter, 100 Fed. Appx. 321, 324-25 (5th Cir. 2004), cert. den., 543 U.S. 966 (2004) (where plaintiff was convicted in Louisiana with resisting an officer, his claim for use of excessive force during his arrest was dismissed pursuant to Heck); Hainze v. Richards, 207 F.3d 795, 798–99 (5th Cir. 2000), cert. den., 531 U.S. 959 (2000) (where plaintiff had been convicted in Texas of aggravated assault with a deadly weapon on a police officer, the force used by the deputies to restrain the defendant, up to and including deadly force, cannot be deemed excessive and plaintiff's excessive force claim was barred pursuant to Heck); Sappington v. Bartee,, 195 F.3d 234, 236-37 (5th Cir. 1999) (where plaintiff was convicted in Texas of aggravated assault with a deadly weapon on a police officer, which required proof of serious bodily injury, his excessive force claims were barred by Heck); Hudson v. Hughes, 98 F.3d 868, 871-73 (5th Cir. 1996) (where plaintiff was convicted in Louisiana for battery of an officer during the course of his arrest his excessive force claim was barred because it necessarily implied the invalidity of his conviction because self-defense was a justification defense to the crime of battery of an officer); contrast Ballard v. Burton, 444 F.3d 391, 397-99 (5th Cir. 2006) (where plaintiff's

conviction for simple assault did not involve bodily injury, his excessive force claim did not necessarily impugn the validity of his conviction).  Aggravated obstruction of a highway of commerce is such a conviction.

The Louisiana crime of aggravated obstruction of a highway of commerce, La. R.S. 14:96, states in pertinent part:

> A. Aggravated obstruction of a highway of commerce is the intentional or criminally negligent placing of anything or performance of any act on any railway, railroad, navigable waterway, road, highway, thoroughfare, or runway of an airport, wherein it is foreseeable that human life might be endangered.

An offender commits the crime of aggravated obstruction of a highway when he or she intentionally or criminally negligently places anything or performs any act on a highway wherein it is foreseeable that human life might be endangered.  See LSA–R.S. 14:96.  See State v. Cox, 2008-0492 (La. 1/21/09, 7), 5 So.3d 869, 872.[4]  Not only obstruction, but also any act which will impede travel and commerce comes within the purview of these articles.  See State v. Williams, 2015-0699 (La. App. 1 Cir. 4/15/16), 2016 WL 1535154 at *3, writ denied, 2016-1035 (La. 5/1/17), 219 So.3d 330 (citing Cox, 5 So.3d at 873, n. 6); see also State v. Smith, 2007-1443 (La. App. 3 Cir.

---

[4] In State v. Winnon, 28,654 (La. App. 2 Cir. 9/25/96), 681 So.2d 463, writ den., 96–2576 (La.3/27/97), 692 So.2d 391, the Second Circuit found defendant had created a foreseeable danger to human life when he placed his vehicle perpendicular to the highway, blocked passage of the victim's vehicle, and then assaulted her.  In that case, the defendant exited the vehicle after blocking the roadway with the vehicle. The court found defendant created an obstruction by the placement of his vehicle across the roadway.  In State v. Cox, the Court found the Defendant created a foreseeable risk to human life by driving into the opposite lane of travel at a high rate of speed, and driving so as to intentionally target the victim's vehicle.  Cox, 5 So.3d at 872–73.  The Louisiana Court of Appeal for the First Circuit found erratic driving witnessed by a private person was sufficient to justify a stop for the felony offense of aggravated obstruction of a highway of commerce.  See State v. Lavergne, 08–0044 (La. App. 1 Cir. 5/2/08), 991 So.2d 86, 90, writ den., 2008-K-1459 (La. 2/20/09), 1 So.3d 494.

1/21/09), 2 So.3d 1187, 1196, writ denied, 2009-0407 (La. 11/6/09), 21 So.3d 300 (weaving in and out of traffic at excessive speed could have foreseeably caused life-threatening accidents).  "Foreseeable" means that which would ordinarily would be anticipated by a human being of average, reasonable intelligence and perception. La. R.S. 14:2(5).  Driving erratically on an interstate highway also constitutes a violation of La. R.S. 14:96.  See Williams, 219 So.3d 330 (citing State v. Lavergne, 2008–0044 (La. App. 1st Cir. 5/2/08), 991 So.2d 86, 90, writ denied, 2008–1459 (La. 2/20/09), 1 So.3d 494).

Small's conviction shows his actions created foreseeable risks that human life might be endangered.  Moreover, Small used his car in such a way as to constitute a deadly weapon.  When Small intentionally crashed his car into the pickup, creating the first crash site, Small injured two of the four occupants of the pickup.

The use of force against a person who is using a moving vehicle as a deadly weapon has been held to be reasonable.  See Sanchez v. Edwards, 433 Fed. Appx. 272, 275 (5th Cir. 2011) (officers acted reasonably in their use of deadly force on defendant when officers had to take action quickly and decisively in response to an oncoming vehicle that was threatening an officer's safety, where defendant had ignored numerous commands from the officers to bring his vehicle to a stop, and there was a short period of time in which the officers had to react to defendant's abrupt change of direction and the officer's obvious peril); Hathaway v. Bazany, 507 F.3d 312, 322 (5th Cir. 2007) (given the extremely brief period of time an officer has to react, officer in close proximity to a car that he had asked to pull over, that then accelerated towards

him, making perception of a serious threat reasonable, it was reasonable to react with deadly force).

More specifically, the evidence showed Small drove backward at a high rate of speed, away from the initial road block, endangering others on the road. Small struck the truck that was about 50 yards behind him in the road, injuring all four passengers. At that point, Small's car was stuck to the truck's bumper. Small then continued to endanger others by accelerating, causing his tires to spin continuously until he gained enough traction for his car to break free of the truck. There was some testimony that Small briefly raised his hands, even while he continued to accelerate, but lowered them again. As Small broke free, shots were fired. One of those shots apparently hit Small in the leg. Small then sped away, weaving in and out of on-coming traffic. The pickup truck with four task force agents eventually caught up to Small just before he entered a busy intersection. The truck bumped Small's car from behind, causing him to spin and stop, again stuck to the truck. Again, there was evidence that Small showed his hands, but continued to spin his wheels in an effort to free his car and take off again. Small refused to exit his vehicle. At that point, a taser was fired at Small through his broken rear window, while other officers broke his passenger side window, removed him from his car, and handcuffed him.

When Small broke his car free from the truck at the first crash site, immediately endangering the lives of the officers at that site, two shots were fired at him in response. Therefore, Small's claim that he was shot after the second crash, after he allegedly surrendered, contradicts the underlying finding that Small's

actions, in breaking free of the crash he has caused and speeding away, were actions that obstructed the highway and foreseeably endangered the officers present.  Small thus attempts to allege the shots were not fired at him in immediate reaction to his actions at the first crash site, in order to prevent harm to the other officers.   Since the trial testimony was that the shots were fired in reaction to a perceived deadly threat by Small, Small's claim tends to negate the sequence of events of the first crash, thereby impugning his conviction to the extent it rested on those events.

Small also contends he was "shot and tased" after he was arrested at the second crash site.   Here, Small attempts to create a strikingly narrow distinction. Essentially, Small argues that his excessive force claim is not barred by <u>Heck</u> because he had effectively surrendered when he was tased, and therefore he was no longer committing the underlying offense.  But to succeed on this argument, Small would have to somehow establish that the jury did not consider his behavior in the moments before he was tased to be part of the offense.  Neither the jury nor the state court drew that distinction.   And this Court certainly cannot do so.   Absent such a distinction, in the trial transcript or elsewhere, this Court can only conclude that Small's actions in the moments before he was tased were part of the course of criminal conduct–meaning Small was using his vehicle in such a way as to endanger human life at that moment.  The trial testimony plainly and emphatically supports that conclusion. The officers testified that, although Small may have raised his hands at some point at both crash sites, he continued his attempts to accelerate and escape until he was finally tased.  Again, the Court need not resolve any factual dispute

regarding those moments.  Rather, the Court concludes that Small's excessive force claim would necessarily impugn his conviction on that basis.

In sum, Small now seeks to negate a key element of his aggravated obstruction conviction by showing he did not act in a manner that endangered human life, thereby doing nothing to warrant the officers' use of force to subdue him.  That is the essence of Small's excessive force claim.  And the opposite was the essence of his underlying criminal conviction.

Therefore, pursuant to settled law, Small's claim of excessive force (battery) necessarily impugns his conviction for aggravated obstruction of a highway (which involved aggravated assault and battery with his vehicle).  Small's claims that the arresting officers intentionally used excessive force (battery claims) should be dismissed without prejudice pursuant to Heck.

### 3.    A stay of this action is not appropriate.

Small asks this Court to issue a stay, pending resolution of the direct appeal in his criminal case, in the event it finds Heck is applicable (Doc. 14).  That request should be denied.  As explained in Heck, 512 U.S. at 488-489, Small has *no* cause of action until his conviction is reversed, expunged, or invalidated.  Therefore, there is no cause of action to be stayed.

## III.   Conclusion

Based on the foregoing, IT IS RECOMMENDED that Small's negligence claims be DENIED AND DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction pursuant to the Eleventh Amendment.

IT IS FUTHER RECOMMENDED that Defendant's Motion to Dismiss (Doc. 11) be GRANTED and that Small's intentional tort claims for battery be DISMISSED WITHOUT PREJUDICE pursuant to <u>Heck v. Humphrey</u>.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this ___21st___ day of September, 2018.

Joseph H.L. Perez-Montes
United States Magistrate Judge